**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Gregory S. Hawn, Michael R. Prince, and Aric A. Aldrich, | ) ) ) | No. CV 04-2954-PHX-SMM |
| | ) | **ORDER** |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| Executive Jet Management, Inc., | ) ) | |
| Defendant. | ) ) ) | |

Currently pending before the Court are Defendant Executive Jet Management, Inc.'s ("EJM") Motion for Summary Judgment (Doc. 123) filed pursuant to Federal Rule of Civil Procedure 56, and Plaintiffs' Motion Requesting Two Statement of Facts Be Deemed Non-Admitted (Doc. 148). The motions are fully briefed and ripe for consideration.

As a preliminary matter, the Court will address Plaintiffs' Motion Requesting Two Statement of Facts Be Deemed Non-Admitted (Doc. 148). Plaintiffs request that the Court issue an order finding that Plaintiffs' responses to Statements of Fact 135 and 139 in Support of Defendant's Motion for Summary Judgment be recognized as disputed, rather than admitted, based on the fact that Plaintiffs' counsel inadvertently and incorrectly asserted that the statements were not in dispute. Plaintiffs' counsel contends that they did not "intend[] to suggest to the Court that Plaintiffs did not dispute the substance of the testimony itself or the credibility of the deponents."

The two statements of fact pertain to the personal beliefs of EJM Executive Vice President Richard Williams and the personal opinion of EJM President Al Pod and were drawn directly from their respective depositions. The Court finds that despite their apparent effort to remedy this situation, Plaintiffs have failed to produce evidence disputing the specific deposition testimony. Rather, Plaintiffs submitted to the Court an affidavit of Plaintiffs' counsel attesting to her intentions in preparing the responses.  Providing an affidavit of Plaintiffs' counsel does not create a material dispute regarding the specific statements of fact, it merely substantiates counsel's attestation regarding her own conduct, rather than calling into question the credibility of the deponents or substance of the statements of fact in question. Thus, the Court is left with no basis to justify issuing an order such as the order requested by Plaintiffs.  Therefore, Plaintiffs' motion (Doc. 148) is hereby **DENIED**.  Moreover, a Court cannot judge the credibility of a witness when ruling on a motion for summary judgment, credibility is a matter for a jury to decide. *Spring Co. v. Edgar*, 99 U.S. 645, 658 (October Term, 1878).

## **PROCEDURAL HISTORY**

This case arises out of EJM's decision to discharge Plaintiffs from their employment at EJM.  EJM contends that there are no genuine issues of material fact in this case and EJM is entitled to judgment as a matter of law.[1]  Plaintiffs, on the other hand, contend that they would not have been discharged for engaging in inappropriate conduct toward a flight attendant had Plaintiffs been non-Caucasian employees, female employees, and/or employees of non-American descent.

On December 21, 2004, Plaintiffs Michael R. Prince ("Prince"), Aric A. Aldrich ("Aldrich"), and Gregory S. Hawn ("Hawn")(collectively referred to as "Plaintiffs") filed a

---

[1] EJM asserts that the undisputed evidence illustrates that it did not discriminate against Plaintiffs on the basis of gender, race, or national origin in terminating Plaintiffs' employment.  Instead, EJM steadfastly asserts that Plaintiffs were terminated because they engaged in inappropriate conduct in the workplace in violation of EJM policy.

Complaint against Defendant EJM.  Therein, Plaintiffs allege that they were  discriminated against based on their gender, race, and national origin with respect to their discharge and as such seek relief under Title VII of the Civil Rights Act of 1964, as Amended, 42 U.S.C. § 2000e, et seq. and 42 U.S.C. § 1981.

## BACKGROUND

Plaintiffs were all formerly employed as pilots for EJM. Prior to their employment, Plaintiffs had previously never worked with flight attendants.

Plaintiffs' terminations all came subsequent to allegations of sexual harassment made by another EJM employee,  flight attendant Robyn McCrea[2] (McCrea).  On or about January 6, 2003, McCrea lodged a verbal complaint regarding conduct allegedly engaged in by Aldrich during a two day training seminar which occurred on January 3rd and 4th of 2003. The complaint was investigated internally, and Aldrich was disciplined on or about January 14, 2003.  On the same date, EJM received a 14-page complaint from McCrea alleging additional incidents of sexual harassment against Aldrich, as well as Prince and Hawn.  Therein, McCrea alleged that she was subjected to hostile work environment sexual harassment based on the alleged actions of all three Plaintiffs. Thereafter, EJM hired a third party investigator to commence an investigation into McCrea's allegations.[3]

Executive Jet's President, Albert C. Pod, solicited the opinions of senior management who had  reviewed the investigator's report. Consequently, Pod determined that McCrea was

---

[2]Plaintiffs also refer to Ms. McCrea as McCrae and McRae.  (Doc. 141)

[3]The investigator, Jim Sterling, compiled his factual findings into a detailed report ("Sterling Report") that was presented to EJM's senior management. The report addressed McCrea's allegations against Plaintiffs; included their rebuttal responses; and included allegations of misconduct lodged by Plaintiffs against McCrea. The Sterling Report did not contain factual findings of misconduct by non-Caucasian, female, or non-American employees.

"more credible than not" in her allegations against Plaintiffs and issued instructions for the discharge of Plaintiffs. The terminations took place on April 18, 2003, and were reportedly for Plaintiffs' "inappropriate behavior."  During the course of EJM's investigation, McCrea filed a charge of discrimination with the EEOC.  Approximately three months after Plaintiffs' termination, the EEOC's investigation into the same allegations of sexual harassment resulted in a determination against EJM for a violation of Title VII.  The  EEOC found merit in McCrea's claim of hostile work environment sexual harassment.

Thereafter, on February 27, 2004 and March 2, 2004, Plaintiffs filed their charges of discrimination with the EEOC. The Commission dismissed the charges on September 22, 2004.  Notwithstanding the dismissal, Plaintiffs herein allege that they were discriminatorily discharged on the basis of gender, race, and national origin.

## UNDISPUTED FACTS

1.    Executive Jet Management is engaged in the business of aircraft management and air charter operations.

2.     Plaintiff Aric Aldrich was employed as a pilot by EJM from May 30, 2001 until April 18, 2003.

3.    Plaintiff Michael Prince was employed as a pilot by EJM from July 26, 1999 until April 18, 2003. [EJM's Response to Prince's First Request for Production]

4.    Plaintiff Gregory Hawn ("Hawn") was employed as a pilot by Executive Jet on the shuttle operations from February 3, 2002 until April 18, 2003. [EJM's Response to Hawn's First Request for Production]

5.    On or about January 6, 2003, a flight attendant on the shuttle operations, Robyn McCrea, contacted her supervisor, Lead Flight Attendant Amy Jackson, with a complaint regarding Aldrich's behavior. [Chakerian Dep.]

6.    Jackson reported the conduct to Chief Pilot Chakerian:

> [McCrea] told me that pilots are rude not just during training, but also at work. I asked her if it was all pilots she was referring to. She said, no –

specifically Aric Aldrich makes her uncomfortable when he discusses topics of a sexual nature and that he makes derogatory remarks toward women. She said that a few of the other pilots will sometimes join in, but that Aric [Aldrich] is the instigator. I asked her if she has told him that his comments make her uncomfortable. She said, yes she has told him numerous times, "I don't want to hear it, please stop." [*Id.*]

7.   McCrea further told Jackson that "this type of behavior is making her work environment uncomfortable to the point that she does not want to go to work if she is scheduled to fly with [Aldrich]." [*Id.*]

8..   Executive Jet's Human Resources Manager, Cynthia Brusman, contacted Chakerian, "indicating that she had been contacted [by McCrea] and wanted to know what was going on" regarding the alleged conduct. [Chakerian Dep. at 14:14-17]

9.   During a conference call on or about January 6 or 7, 2003, with Vice President of Flight Operations Dan O'Neal, Director of Operations George Curtis, Brusman and Chakerian, it was decided that Brusman would speak with McCrea regarding the alleged conduct of Aldrich. [Chakerian Dep.]

10.   Chakerian was instructed to investigate the allegations made by McCrea against Aldrich. [Chakerian Dep. at 14:18-24]

11.   During the investigation, fellow EJM employee Stoffel reported that Prince raised the subject of animals and sex shows. [Chakerian Dep. at 65:15-19]

12.   With regard to the comment about animals and sex shows, Chakerian testified, "I believe what Mr. Aldrich had said was that he hadn't said that, and that Mr. Prince had said it." [*Id.* at 67:8-13]

13.   Meanwhile, Brusman spoke with McCrea about the allegations and asked McCrea to put them in writing and send them to her. [Brusman Dep. at 72:8-10]

14.   Chakerian then met with Brusman and EJM's President, Albert C. Pod, regarding the results of his investigation. [Brusman Dep. at 59:7-14]

15.   Brusman did not find Chakerian's report to be credible. According to her: "Based on what I had already heard from [McCrea], and what [Chakerian] was saying, my gut feeling

- 5 -

1  was it wasn't jiving, and that he was basically defending Aldrich. I didn't believe a word he

2  said." [*Id*. at 59:18-25, 60:1-2]

3  16.    Chakerian testified that Aldrich admitted that "he had joked around with the crew."

4  [Chakerian Dep. at 79:10-16]

5  17.    Chakerian and Aldrich also met with O'Neal and Curtis while they were in Cincinnati.

6  [Chakerian Dep.]

7  18.    According to Chakerian's testimony and a letter he wrote regarding the issue, during

8  the meeting in O'Neal's office, O'Neal issued Aldrich a verbal warning. [*Id.*]

9  19.    According to Chakerian:

10     Mr. Aldrich started the progressive disciplinary process in early January,
       2003 in Cincinnati by Mr. Dan O'Neal, Vice-President of Operations. George
11     Curtis and I witnessed the counseling session and verbal warning he received
       for the behavior for which he is now being terminated. [*Id.*]
12 20.    Chakerian testified that O'Neal admonished Aldrich:

13     You're in a leadership position now as lead of the Arizona domicile. And
       joking around and being part of the group takes on a different meaning when
14     you're in a leadership position....You just can't joke with your staff as being
       part of that staff. You have to be more discrete.
15     [Chakerian Dep. at 39:21-25, 40:1-2]

16 21.    On or about January 14, 2003, McCrea telefaxed written allegations to Brusman

17 pursuant to the request of the Human Resources Manager. [Brusman Dep.]

18 22.    Brusman took the document to Pod and they reviewed the additional allegations of

19 harassment. [*Id*. at 76:11-17]

20 23.    O'Neal called Pod, who indicated the Company had just received a 14- page telefax

21 from McCrea with additional allegations of hostile environment involving Aldrich, including:

22     One evening at dinner with Aldrich, Tonti and EJM pilot Paul Moenning,
       Aldrich made rude gestures across the table at McCrea, including
23     "mimick[ing] oral sex with his tongue." [EJM'S Response to Prince's 3rd
       Request for Production ("Sterling Report")
24
       During a meal at Denny's Restaurant, Aldrich related to McCrea and Stoffel
25     an incident about his prior employment with another company wherein a
       client "sent two naked hookers up to the cockpit and they sat on his lap." [*Id.*]
26

27

28                              - 6 -

1

> Aldrich asked McCrea whether she cleaned or touched her horse's penis, and then continued to talk about people "having sex with their horse." [*Id.*]

2

3

> Aldrich made a remark to her regarding "tea bagging," in reference to oral sex. [Doc. #MP02658]

4

5

> Aldrich referred to his wife as a "dirty bitch" or "dirty whore" and frequently discussed "the fact that they never ha[d] sex anymore…." [Doc. #MP02646]

6  24.   McCrea also claimed that Prince engaged in conduct creating a hostile work

7  environment, including:

8

> While returning from lunch one day, Prince commented that "he sure would love to suck on Pamela Anderson's tits, and how does she breastfeed her kid with those?" [Doc. #MP02649]

9

10

> Sending McCrea e-mail messages of a sexual nature or sexual in content. [Doc. #MP02670-MP02720]

11

12

> Discussing women having sex with donkeys. [Doc. #MP02655]

13

> Discussing a video about "a woman tied up, acting like she enjoyed it, being gang raped and assaulted." [*Id.*]

14

> Telling dirty jokes, including one with a punch line involving testicles. [Doc. #MP02656]

15

16

> While seated next to Prince in an airport, he signaled to her by pointing his finger to his groin area while watching a suggestively dressed woman pass by to imply that he was having an erection or that looking at the woman gave him such an idea. [Doc. #MP02657]

17

18  25.   McCrea further claimed that Hawn engaged in conduct creating a hostile work

19  environment, including:

20

> Pinching her on the buttocks. [Doc. #MP02650]

21

> Discussing with Aldrich in her presence "the merits of a woman who claims to have sex with hundreds of men." [*Id.*]

22

23

> Encouraging an EJM employee to lift up her shirt and "flash" him because it was his birthday. McCrea confronted Hawn in the crew lounge and in the presence of Stoffel, among others, told him that his conduct was "inappropriate and could be considered as sexual harassment." [Doc. #MP02650-51]

24

25

> Telling dirty jokes, including a joke regarding oral sex. [Doc. #MP02656]

26

27

> Making a remark to her regarding "tea bagging" in reference to oral sex.

28

1          [Doc. #MP02658]

2    26.      On January 27, 2003, McCrea filed a Charge of Discrimination alleging hostile work

3    environment with the Equal Employment Opportunity Commission ("EEOC" or

4    "Commission"). [Brusman Dep. at 113:11-19]

5    27.      Executive Jet retained the services of International Security Associates ("ISA") to

6    investigate the new allegations of hostile work environment by McCrea. [Pod Dep. at 29:1-6]

7    28.      James ("Jim") Sterling was assigned to the fact-finding investigation. During the

8    period from January 31 through March 24, 2003, Sterling interviewed 21 individuals,

9    including McCrea, a third party trainer, and current and former EJM employees. [Sterling

10   Report]

11   29.      At the outset of his interview with Prince, Sterling noted in his report that "Capt.

12   Prince appeared to be very nervous throughout the interview. He excused himself twice

13   during the interview to go to the bathroom. The first time was shortly after we started." [Doc.

14   #MP02599]

15   30.      Sterling also reported that Prince was not forthcoming with revealing a certain e-mail

16   address at the outset of the interview. [*Id.*]

17   31.      Prince reported to Sterling that McCrea "hit him on the butt twice." [Doc. #MP02603]

18   32.      Sterling continued: "I asked him if he reported it to anyone and he said no." [*Id.*]

19   33.      Sterling further reported: "I asked him if there was anything else that he wanted to add

20   and he replied no, but I do have a question for you. I said okay, and he asked me if he should

21   start looking for another job? I explained to him that was not my call. I shared with him that

22   the company would review my report and that they would decide what if anything should be

23   done." [*Id.*]

24   34.      Subsequent to the meeting with Sterling, Prince became concerned that his job was

25   in jeopardy based on the content of the meeting and the nature of the questions asked by

26   Sterling. [Prince Dep. at 100:22-25, 101:2]

27

28                                    - 8 -

35.    Aldrich and Sterling met for approximately three hours. [Aldrich Dep. at 92:20-21 ]

36.    During the meeting, Aldrich had an opportunity to rebut McCrea's allegations. [*Id.* at 94:8-18]

37.    During his interview, Aldrich denied relating a story to McCrea and Stoffel wherein "two naked hookers [came] up front and [sat] on his lap." [Doc. #MP02604]

38.    Sterling reported: "When I asked him to describe what he said to McCrea he replied: 'he was relating a situation where a customer had two (2) strippers flying with him and that they said hello to him, that's all.'" [*Id.*]

39.    Sterling reported that Aldrich admitted to telling "dirty jokes" in the cockpit. [Doc. #MP02605]

40.    Sterling reported: "I asked him if this was documented and he said no. I then asked why none of these 'talks' were ever documented? He explained that Mr. Chakerian had told him 'to talk to them, not to write anything down.'" [*Id.*]

41.    At the conclusion of the interviews, Sterling presented a written report of the fact-finding investigation, with exhibits, to EJM. [Doc. #MP02576-MP02745]

42.    Brusman read the report. [Brusman Dep. at 79:25, 80:1]  She was of the opinion that Prince, Hawn and Aldrich should be terminated. [Brusman Dep. at 49:12-16, 66:3-5, 66:15-25, 67:1; Pod Dep. at 15:17-25]

43.    Vice President O'Neal was also of the opinion that Prince, Hawn, and Aldrich should be terminated. [Pod Dep. at 14:8-25]

44.    Executive Vice President Richard Williams read the Sterling Report and believed that a majority of McCrea's allegations had been substantiated; that sexual harassment had occurred; and that the Plaintiffs should be terminated. [*Id.* at 12:17-19, 13:10-18]

45.    President Al Pod inquired of Brusman and/or O'Neal "how they saw the facts." [Pod Dep. at 25:4-25, 26:1-12]  He also asked Williams for his opinion. [Williams Dep. at 11:17-

18]  Pod, likewise, read Sterling's report and was of the opinion that McCrea was "[m]ore credible than not.". [Pod Dep. at 8:16-17; 33:14-19]

46.    Pod decided to terminate Prince, Hawn and Aldrich. [Response No. 9, EJM's Responses to Prince's First Set of Interrogatories; Response No. 1, EJM's Responses to Hawn's First Set of Interrogatories; Response No. 1, EJM's Responses to Aldrich's First Set of Interrogatories]

47.    On Friday, April 18, 2003 Pod instructed Hal Raber, Director of Operations, to discharge Prince, Hawn and Aldrich. [Hal Raber Dep. at 7:4-10, 17:15-20]

48.    Pod did not discuss with Raber the nature of the allegations against Prince, Hawn, and/or Aldrich. [*Id.* at 16:22-25, 17:1-5, 17:21-25]

49.    Raber traveled to Phoenix on Sunday, met with each pilot, and advised each of his termination from EJM. [*Id.* at 16:16-21; Prince Dep. at 101:3-25, 102:1-21; Hawn Dep. at 39:8-23; Aldrich Dep. at 105:1-12]

50.    Prince testified that he understood that his termination was based on the allegations of Robyn McCrea: "I figured it had to do something with the investigation and the investigation led me to believe Robyn McCrea." [*Id.* at 102:10-21][4]

51.    The termination letters read, in part:

> It has been determined that you have exhibited job behaviors that are in violation of the Executive Jet Management Employee Handbook Policy #126. Therefore your employment with Executive Jet Management is terminated, effective immediately. [Prince Dep.; Hawn Dep.;Aldrich Dep.]

52.    On July 16, 2003, the EEOC issued a determination finding merit to McCrea's charge of discrimination and sexual harassment in violation of Title VII of the Civil Rights Act of 1964.  According to the Commission:

---

[4]Prince also testified that he believes he was terminated because he did not fall into a traditional protected class because of his age and because he is a "white man." [Prince Dep. at 62:1-25, 64:7-23, 65:19-66:4.]

- 10 -

Examination of the evidence revealed that Respondent fostered a hostile work environment created by demeaning, crude, derogatory sex-based remarks and touching by male managers and employees. Despite Respondent's denial, the evidence shows that the charging party was required to work in a hostile environment in which derogatory, sex-based vulgar comments were regularly used and inappropriate touching occurred...*** [*Id.*]

53.     Plaintiffs identify their race as "Caucasian." [Complaint ¶7, Docket No. 1, filed December 21, 2004.]

54.     Prince testified that he did "not necessarily" believe that EJM targeted him for discharge because he is Caucasian. [Prince Dep. at 64:22-25, 65:2-3][5]

55.     Prince further testified that he did not know what EJM's motivation was in terminating his employment. [*Id.* 65:10-11]

56.     Hawn testified that he believed he was terminated by EJM "to let EJM wash their hands of the situation and make themselves right in the eyes of the EEOC," and "to appease the EEOC of the lawsuit by Robin [sic] McCrea." [Hawn Dep. at 34:10-18, 105:16-20]

57.     Aldrich testified that he "was terminated due to the sexual harassment charges." [Aldrich Dep. at 102:20-23]

58.     Prince identified his national origin as "born in the United States." [Prince Dep. at 62:15-16]

59.     Hawn identified his national origin as "American." [Hawn Dep. at 104:20-25, 105:1]

60.     Aldrich identified his national origin as "Caucasian American of European descent." [Aldrich's Responses to EJM's First Set of Interrogatories, Requests for Admissions and Production of Documents]

61.     Brusman testified that if an employee sends a sexually explicit e-mail message from his/her home account to another employee's home account, EJM does not become involved in the matter because the Company "can't regulate what they do at home." [Brusman Dep.

---

[5]Prince also testified that he believes he was terminated because he did not fall into a traditional protected class because of his age and because he is a "white man." [Prince Dep. at 62:1-25, 64:7-23, 65:19-66:4.]

1    at 31:3-8]   However, if the recipient of the e-mail complains to EJM, the Company

2    investigates the matter, "even if [the e-mail is] sent to their home." [*Id*. at 31:22-24]

3    62.    Executive Jet's business e-mail accounts end with "EJMJets.com" or "NetJets.com."

4    [Brusman Dep. at 119:14-16]

5    63.    Kropoff forwarded e-mail messages identified by Jim Sterling in his report as "Exhibit

6    #9" through "Exhibit #19" to Prince, among others. [Doc. #MP02670-MP02720].

7    64.    Prince subsequently forwarded the emails to McCrea. [*Id*.]

8    65.    McCrea provided these e-mail messages to Sterling during his investigation into her

9    complaints of sexual harassment. [Doc. # MPO2594-MP02595]

10   66.    Kropoff used the following e-mail account when forwarding the e-mail messages to

11   Prince: "Brandy Kropoff"<bmwaters2002@yahoo.com [Doc. # MP02671, MP02675,

12   MP02681, MP02688, MP02693, MP02698, MP02702, MP02706, MP02709, MP02713,

13   MP02717]

14   67.    Prince did not complain to EJM management about the e-mails he received from

15   Kropoff. [Prince Dep. at 20:16-20]

16   68.    Prince testified that he also received e-mail messages from Leihgeber, although he

17   could not recall the content of the e-mails. [Prince Dep. at 18:20-25, 19:1-21]

18   69.    Prince testified that he did not report Leihgeber's e-mails until he was interviewed by

19   Sterling. [*Id.* at 20:21-25, 21:1-7]

20   70.    Prince testified that O'Neill told a joke during a training event with a punch line that

21   referred to testicles; specifically, "If ice is to icicle, what is test to?" [Prince Dep. at 32:8-25,

22   33:1-23]

23   71.    Prince also testified "[O'Neill] told me I couldn't handle her, meaning sexually." [*Id*.

24   at 34:15-24]

25   72.    Prince did not complain to EJM management about O'Neill's joke or comment. [*Id.*

26   at 35:13-24]

27

28                                              - 12 -

73.    Prince testified that Powell "would count the days and let people know how many days it had been since she had sex." [*Id*. at 36:4-6]

74.    Prince did not complain about Powell's conduct to EJM management. [*Id*. at 36:12-18]

75.    Prince testified that McCrea "would pat [him] on the butt" on two occasions; told jokes, "some of them being sexual;" and "alluded to [Prince's] having many videos, X-rated videos." [*Id*. at 22:8-25, 23:1-25, 24:2-21]

76.    Prince did not tell McCrea to stop touching him or telling jokes and did not report McCrea's conduct to EJM management until after the investigation into his alleged misconduct. [*Id*. at 25:13-25, 26:1-8]

77.    Hawn testified that Powell "told dirty jokes," "was very open about her sexuality," and "was very physical in nature. She was kind of very playful, and it was more of that kind of just flirting." [Hawn Dep. at 74:13-19, 75:4-7]

78.    Hawn never told Powell to stop touching him, telling dirty jokes, or talking about sex in his presence. [*Id*. at 76:23-25, 77:1-6] Nor did he report Powell's conduct to EJM management. [*Id*. at 76:12-1]

79.    Hawn testified that he received e-mails from Kropoff containing jokes and pictures of a sexual nature, and provided his personal email address.[*Id*. at 77:7-13, 78:10-11]

80.    Hawn never told Kropoff to stop sending him such e-mails. [*Id.* at 79:16-23]

81.    The e-mails sent by Kropoff that are included in the Sterling Report do not show that Kropoff sent any of the e-mails to Hawn at "ghawn@qwest.net" or any other e-mail address used by Hawn. [Doc. #MP02671, MP02675, MP02681, MP02688, MP02693, MP02698, MP02702, MP02706, MP02709, MP02713, MP02717]

82.    Hawn did not report Kropoff's conduct to EJM management. [Hawn Dep. at 81:2-9]

83.     Hawn testified that Leihgeber sent him e-mails. [*Id*. at 80:5-10] But Hawn never told Leihgeber to stop sending him e-mails. [*Id*. at 80:24- 25, 81:1] Nor did Hawn report Leihgeber's conduct to EJM management. [*Id*. at 81:10-12]

84.     Hawn testified that McCrea "patted [his] butt," tickled him, and invited him to her hotel room on one occasion to watch television. [*Id*. at 71:24-25, 72:1-3, 73:6-17] Hawn never told McCrea to stop touching or tickling him. [*Id*. at 76:20- 22] Nor did Hawn report McCrea's condut to EJM management. [*Id*. at 74:7-12]

85.     Aldrich testified that Leihgeber sent him e-mails with inappropriate material. [Aldrich Dep. at 13:5-11] Aldrich never told Leihgeber to stop sending such e-mails. [*Id*. at 16:10- 12] Nor did Aldrich report Leihgeber's conduct to EJM management while he was receiving the e-mails. He testified that he mentioned Leihgeber's e-mails to Chakerian only when the Company began investigating McCrea's allegations of sexual harassment against him. [*Id*. at 15:12-24, 16:1-6]

86.     Chakerian's report does not mention Leihgeber's e-mails. [Chakerian Dep.]

87.     Aldrich testified that Kropoff sent him inappropriate e-mails. [Aldrich Dep. at 18:24- 25, 19:1] Aldrich never told Kropoff to stop sending him e-mails. [*Id*. at 19:21-23] Nor did Aldrich report Kropoff's conduct to EJM management while he was receiving the e-mails. He testified that he mentioned Kropoff's e-mails to Chakerian only when the Company began investigating McCrea's allegations of sexual harassment against him. [*Id*. at 19:13-20]

88.     Chakerian's report does not mention Kropoff's e-mails. [Chakerian Dep.]

89.     Aldrich testified that Powell would tell "dirty jokes," but only "[o]ccasionally when [he] flew with her." [Aldrich Dep. at 25:14-25, 26:1]   Aldrich never told Powell to stop telling dirty jokes. [*Id*. at 26:23-25] Nor did Aldrich report Powell's conduct to EJM management while the conduct was ongoing. He testified that he mentioned Powell's conduct to Chakerian only when the Company began investigating McCrea's allegations of sexual harassment against him. [*Id*. at 26:13-22]

- 14 -

1   90.     Chakerian's report does not mention Powell's conduct. [Chakerian Dep.]

2   91.     Aldrich testified that O'Neill sent e-mails containing dirty jokes to his personal e-mail

3   account and that he read these e-mails at night while at home and off duty. [Aldrich Dep. at

4   47:10-23, 48:2-8]

5   92.     Aldrich testified that McCrea "told dirty jokes," ["t]alked about sex," and "sent [him]

6   e-mails [containing] dirty jokes." [Aldrich Dep. at 20:7-22]  Aldrich never told McCrea to

7   stop telling jokes, talking about sex or sending him e-mails. [*Id*. at 22:8-16]  Aldrich did not

8   report McCrea's conduct to EJM management until the Company began investigating

9   McCrea's allegations of sexual harassment against him.

10  [*Id.* at 22:17-25, 23:1-23]]

11  93.     Chakerian testified that Hawn identified McCrea as having engaged in conduct similar

12  to that which resulted in his termination and that she was treated more favorably by EJM. [*Id.*

13  at 89:23-25, 90:1-4]

14  94.     Chakerian further testified that neither Prince, Hawn, nor Aldrich reported or

15  identified to him any *non-Caucasian* or "*non American*" employees of EJM who engaged

16  in the same or similar conduct that they engaged in that resulted in their terminations, but

17  who were treated more favorably than them. [Chakerian Dep. at 86:2-24, 87:15-20, 90:14-17,

18  93:3-8, 87:9-14, 87:22-25, 88:1-14, 92:16-25, 93:1- 8]

19  95.     Chakerian's subsequent correspondence to Vineyard upon learning that Prince, Hawn,

20  and Aldrich were going to be terminated identifies only McCrea and Daryl Fuller as having

21  engaged in conduct warranting termination. [Chakerian Dep.]

22  96.     Neither Prince, Hawn, nor Aldrich reported or identified to Sterling any non-

23  Caucasian or non-American employees of EJM who engaged in the same or similar conduct

24  that they engaged in, but who were treated more favorably. [Affidavit of James Sterling

25  ("Sterling Affidavit") ¶¶ 5-15]

26

27

28                                          - 15 -

1    97.    With the exception of McCrea, neither Prince, Hawn, nor Aldrich reported or

2    identified to Sterling any female employees of EJM who engaged in the same or similar

3    conduct that they engaged in, but who were treated more favorably. [Sterling Affidavit ¶¶

4    6, 8-11, 13, 14]

5    98.    On September 22, 2004, the EEOC dismissed Plaintiffs' charges of discrimination

6    against Executive Jet. [Doc. #MP00062, GH00001, AA00009]

7    **STANDARD OF REVIEW**

8    A court must grant summary judgment if the pleadings and supporting documents,

9    viewed in the light most favorable to the nonmoving party, "show that there is no genuine

10    issue as to any material fact and that the moving party is entitled to judgment as a matter of

11    law." FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986);

12    *Jesinger v. Nevada Federal Credit Union*, 24 F.3d 1127, 1130 (9th Cir. 1994). Substantive

13    law determines which facts are material. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248

14    (1986); *see also Jesinger*, 24 F.3d at 1130. "Only disputes over facts that might affect the

15    outcome of the suit under the governing law will properly preclude the entry of summary

16    judgment." *Anderson*, 477 U.S. at 248. The dispute must also be genuine, that is, the

17    evidence must be "such that a reasonable jury could return a verdict for the nonmoving

18    party." *Id.*; *see Jesinger*, 24 F.3d at 1130.

19    A principal purpose of summary judgment is "to isolate and dispose of factually

20    unsupported claims." *Celotex*, 477 U.S. at 323-24. Summary judgment is appropriate

21    against a party who "fails to make a showing sufficient to establish the existence of an

22    element essential to that party's case, and on which that party will bear the burden of proof

23    at trial." *Id.* at 322; *see also Citadel Holding Corp. v. Roven*, 26 F.3d 960, 964 (9th Cir.

24    1994). The moving party need not disprove matters on which the opponent has the burden

25    of proof at trial. *See Celotex*, 477 U.S. at 323-24. The party opposing summary judgment

26    need not produce evidence "in a form that would be admissible at trial in order to avoid

27

28    - 16 -

1  summary judgment." *Id.* at 324.  However, the nonmovant "may not rest upon the mere

2  allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing

3  that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *see Matsushita Elec. Indus. Co.,*

4  *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-88 (1986); *Brinson v. Linda Rose Joint*

5  *Venture,* 53 F.3d 1044, 1049 (9th Cir. 1995).

6                                           **DISCUSSION**

7        Plaintiffs contend, among other things, that they would not have been discharged for

8  engaging in allegedly inappropriate conduct toward a flight attendant had they been non-

9  Caucasian employees, female employees, and/or employees of non-American descent.

10  Defendants contend, however, that Plaintiffs are unable to establish a prima facie case of

11  employment discrimination based on gender, race, or national origin.

12        **A.    Direct Evidence**

13        Plaintiffs may establish a claim of employment discrimination either by presenting

14  direct evidence of discrimination or by establishing a *prima facie* cases of race, national

15  origin, or sex discrimination using indirect evidence**.**

16        Plaintiffs contend that Defendant's CEO, Albert Pod was made aware of protected

17  categories when assessing disciplinary cases, and such awareness is direct evidence of

18  discrimination.  They argue that Pod directed Human Resources Manager Cynthia Brusman

19  to advise him of an employee's protected status, and *always* wanted this information when

20  making discharge considerations. However, there is no evidence in the record that Brusman

21  in fact informed Pod, or any other member of the senior management team, that Plaintiffs are

22  Caucasian, American males. There is also no evidence that Pod or the senior managers

23  recommending termination *considered* Plaintiffs' sex, race, or national origin in their

24  decisions regarding termination of Plaintiff. Plaintiffs' mere speculation, without more, that

25  they were discharged **because** they are Caucasian, American males is insufficient to rise to

26  the level of direct evidence and overcome summary judgment.  It is well-settled that

27

28                                            - 17 -

1  "[r]eliance on mere speculation, conjecture, or fantasy cannot defeat a motion for summary

2  judgment." *Villodas v. HealthSouth Corp.,* 338 F.Supp.2d 1096, 1104-05 (D. Ariz. 2004);

3  *see also, Nelson,* 83 F.3d at 1081-82 ("mere allegation and speculation do not create a factual

4  dispute for purposes of summary judgment.")

5        Furthermore, the Court finds that when reviewing disciplinary matters, employers are

6  not prohibited from merely *assessing* risks based on an employee's protected status because

7  *prima facie* discrimination occurs only when the adverse employment decision is *based on*

8  or *because of* the employee's sex, race, national origin or other protected category.  *See St.*

9  *Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506 (1993). While Pod may have an awareness

10  of an employee's protected status, there is no evidence in the record that he based his

11  disciplinary decisions on this factor. Pod testified repeatedly that his decisions are based "on

12  the merits of the case." Here, the "merits of the case" concerned Plaintiffs' inappropriate

13  conduct toward Robyn McCrea, which was documented in the Sterling Report, and included

14  several admissions by Plaintiffs of such misconduct. Pod reviewed the report and finding

15  McCrea's version more credible than Plaintiffs' accounts, determined Plaintiffs should be

16  discharged for inappropriate conduct under company policy. Plaintiffs have produced no

17  evidence to the contrary, and have thus failed to establish that Pod based his decision to

18  terminate their employment because of their sex, race, or national origin.

19        **B.      Prima Facie Case Under Title VII:** *McDonnell Douglas* **and its Progeny[6]**

20        Where Plaintiff is faced strictly with indirect evidence of discrimination, the proper

21  legal framework for determining whether Plaintiffs' claims should survive summary

22  judgment is the burden-shifting model set forth in *McDonnell Douglas Corp. v. Green*, 411

23  U.S. 792.  Pursuant to *McDonnell Douglas* and its progeny, Plaintiffs have the initial burden

24

25

26        [6] "Analysis of an employment discrimination claim under § 1981 follows the
     same legal principles as those applicable in a Title VII disparate treatment case."
27  *Villodas v. HealthSouth Corp.*, 338 F. Supp. 2d 1096, 1105 (D. Ariz. 2004).

28                                         - 18 -

of establishing a prima facie case of discrimination. *Id*. at 802.  More specifically, to survive summary judgment in an employment discrimination case such as this, a Plaintiff must demonstrate that (1) he belongs to a protected class, (2) he was qualified for the position, (3) he was subjected to an adverse employment action, and (4) similarly situated[7] individuals (of another race, national origin, or gender) were treated more favorably. *See St. Mary's,* 509 U.S. at 506.  If the Plaintiffs succeed in establishing a prima facie case of discrimination based on gender, race, and/or national origin, the burden (of production) shifts to defendant, in this case EJM, to articulate a legitimate, nondiscriminatory reason for terminating the Plaintiffs' employment. *McDonnell Douglas*, 411 U.S. at 802.  If EJM is successful in doing so, meeting its burden necessarily causes any presumption that the employer discriminated against the plaintiff to "drop from the case" and the burden shifts back to Plaintiffs to demonstrate that EJM's articulated reason(s) is pretext for unlawful discrimination.[8] *Bodet*

---

[7]On October 26, 2007, Plaintiffs' counsel filed a Supplemental Citation to Authority in Support of Plaintiffs' Response to Defendant's Motion for Summary Judgment. (Doc. 153) Therein, Plaintiffs represented to this Court that the United States Court of Appeals for the Ninth Circuit  issued an Opinion related to one of the issues pending in this case.  More specifically, Plaintiff represented to the Court that the Ninth Circuit held in *Noyes v. Kelly Svcs.*,488 F.3d 1163 (9th Cir. 2007) that plaintiff need not proffer evidence of similarly situated individuals to create a prima facie case of employment discrimination. In fact, this is *not* what the Ninth Circuit held. Moreover, the Ninth Circuit did not even *address* the issue of "similarly situated," as the prima facie case was not on appeal.  The issues on appeal were (1) pretext and (2) the District Court's discretion with regard to extending discovery deadlines.  The Court of Appeals held that the employee plaintiff was not required to show that she was member of protected class in order to make out prima facie case of "reverse" religious discrimination, and the district court abused its discretion in refusing to extend the discovery deadline. *Id.* Thus, *Noyes* has no bearing on this case.

[8]While the burden of production shifts in this framework, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450, U.S. at 253; *Bodet v. Coxcom, Inc.,* 366 F.3d 736, 743 (9th Cir. 2004)(citations omitted).

*v. Coxcom, Inc.,* 366 F.3d 736, 743 (9th Cir. 2004)(citation omitted). Thereafter, Plaintiffs must demonstrate that the proffered reason was not the *actual reason* for the [adverse] employment decision. Plaintiffs may succeed in this "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256 (U.S. 1981)(*citing McDonnell Douglas*, 411 U.S., at 804-805).

Where the plaintiff has established a *prima facie* case with direct evidence of discriminatory intent, "a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial." *Bodet,* 366 F.3d 736, 743 (9th Cir. 2004)(citation omitted). However, where a plaintiff relies upon indirect evidence to show that the employer's stated reason for the adverse employment action is not the actual reason, "[s]uch evidence…must be 'specific' and 'substantial' in order to create a triable issue with respect to whether the employer intended to discriminate on the basis of a prohibited ground." *Id*. (citation omitted).

### 1.    Race and National Origin

Defendants contend that Plaintiffs are neither members of a protected class (prong one), nor qualified for their positions (prong two).

### **Protected Class**

It is well established that Title VII makes it unlawful for an employer to discriminate against any individual with respect to the terms and conditions of employment "because of such individual's race color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). This includes white males, whether they are part of the minority or majority. *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 659 (9th Cir. 2002)(citing *McDonald v. Santa Fe Trail Trans Co.,* 427 U.S. 273, 278-79 (1976)). Thus, contrary to Defendant's assertion otherwise, despite being Caucasian-American, Plaintiffs are in fact members of a protected

1   class under Title VII.  See *McDonald*, 427 U.S. at 278 (employment criteria must be applied
2   alike to employees of all groups). Therefore, Plaintiffs have satisfied the first element of the
3   prima facie case of employment discrimination.

4   **Qualified for the Position**

5       As to the second prong of the *prima facie* case of employment discrimination,
6   Defendants contend that *because of* Plaintiffs' conduct toward McCrea, the conduct that
7   allegedly led to their discharge (e.g. the "inappropriate conduct"), Plaintiffs were not
8   qualified for their positions.[9]  In other words, Defendant argues that the misconduct itself
9   renders the Plaintiffs unqualified for the positions. The Court does not however come to the
10  same conclusion.  Based on the Defendant's analysis, it is permissible to base the
11  determination of whether an employee was qualified for the position he or she was in prior
12  to the adverse employment decision on the allegedly inappropriate conduct giving rise to the
13  lawsuit.  However, under such a regime, the remainder of the *McDonnell Douglas*
14  framework, and the prima facie case for that matter, would be rendered superfluous in the
15  current scenario and many other similar employment discrimination cases. Plaintiffs are not
16  denying that specific conduct occurred, rather, they are denying that such conduct amounted
17  to justification for the adverse employment action that consequently resulted.  The Court
18  finds that the intent behind this particular prong is to ensure that the employee was otherwise
19  qualified for the position of employment as it relates to the actual performance of necessary
20  duties and the skills required for the position.  Accordingly, Plaintiffs have satisfied their
21  burden of demonstrating that they were otherwise qualified to perform the *skills of pilots,*
22  thereby establishing the second prong of the prima facie case of employment discrimination.

---

26  [9]Defendants only cited to an unpublished district court opinion from the Northern
27  District of CA, which under the rules, is only permissible persuasive authority on this
    Court. (Doc. 123, p. 7) .

28

1

**Adverse Employment Action**

2    Defendant does not dispute the fact that Plaintiffs' discharge from employment

3  amounts to an adverse employment action under the law.  Thus, Plaintiffs have satisfied their

4  burden of establishing the third prong of the prima facie case of employment discrimination.

5  **Similarly Situated**

6    Before the burden will shift to the Defendants as dictated by the *McDonnell Douglas*

7  regime, Plaintiffs must satisfy the final prong of the prima facie case by establishing that

8  similarly situated individuals of another race and/or national origin were treated more

9  favorably than Plaintiffs engaging in similar conduct.  To do so, Plaintiffs must establish that

10  non-Caucasian, non-American employees who engaged in similar conduct were treated more

11  favorably by EJM than were Plaintiffs.  *Aragon v. Republic Silver State Disposal, Inc.,* 292

12  F. 3d 654, 660 (9th Cir. 2002).  According to the evidence before the Court, Plaintiffs have

13  unequivocally failed to articulate any scenario wherein there is any reference to fellow

14  employees of EJM outside the Plaintiffs' protected class (race or national origin) who

15  allegedly engaged in similar "inappropriate conduct" in the workplace, yet were treated more

16  favorably by EJM.  The facts establish that the individuals that Plaintiffs named as having

17  participated in similar conduct were in fact Caucasian and of American descent, the identical

18  race and national origin as the Plaintiffs.  Consequently, Plaintiffs have failed to establish the

19  final prong of the prima facie case of discrimination based on race or national origin.  *See*

20  *Kelley v. City of Mesa*, 873 F. Supp. 320, 331 (D. Ariz. 1994)(summary judgment granted

21  in favor of defendants on Plaintiff's § 1981 claim where Plaintiff failed to "present any

22  proper evidentiary material showing that she was terminated because of her race or national

23  origin").

24    Accordingly, it is not necessary for the Court to continue its analysis to the second

25  stage of the *McDonnell Douglas* test (e.g. EJM need not assert a legitimate,

26

27

28                                        - 22 -

1    nondiscriminatory reason for discharging Plaintiffs) as to Plaintiffs' claims of discrimination
2    based on race or national origin.

3                              **2.    Gender**

4          Assuming arguendo, however, that Plaintiffs have established the first three prongs
5    of their prima facie case of (gender) discrimination,[10] EJM contends that similar to the
6    aforementioned analysis of race and national origin, Defendant is entitled to summary
7    judgment as to Plaintiffs' claim of gender discrimination because Plaintiffs have failed to
8    produce evidence of similarly situated female employees who were treated more favorably
9    by EJM.  Plaintiffs,  however, contend that substantial evidence exists supporting their
10   contention that female employees of EJM participated in similar conduct as Plaintiffs, for
11   which Plaintiffs were consequently discharged, yet the female employees were treated more
12   favorably by EJM.  Plaintiffs follow up their argument with the contention that Defendant's
13   stated explanation for terminating Plaintiffs is pretext.

14   **Similarly Situated**

15         EJM contends that Plaintiffs have not established the fourth prong of their *prima facie*
16   case of gender discrimination because they have not presented evidence that similarly
17   situated female employees were treated more favorably by EJM.   Critical to this
18   determination is establishing a baseline for the phrase "similarly situated." "To be similarly
19   situated, coworkers must have been dealt with by the same supervisor, subject to the same
20   standards, and engaged in similar conduct." *Hargrow v. Federal Express Corporation*, 2006
21   U.S. Dist. LEXIS 4187 at *14-15 (D. Ariz. Feb. 2, 2006)(citations omitted). "[I]ndividuals

22

23

24          [10]   The analysis for the following prongs are identical for race, national origin,
25   and gender, *see supra*: protected class (as males, Plaintiffs are members of a protected
     class, *see supra*), otherwise qualified (Plaintiffs are otherwise qualified for their positions,
26   *see supra*), and adverse employment action (the termination of Plaintiffs' employment
27   amounts to an adverse employment action, *see supra*).

28                              - 23 -

1    are similarly situated when they have similar jobs and display similar conduct.  *Vasquez v.*

2    *County of Los Angeles,* 349 F.3d 634, 641 (9th Cir. 2003).

3        Here, Plaintiffs reported to Chief Pilot Michael Chakerian. However, flight attendants

4    Robyn McCrea, Karen O'Neill and Marlee Powell reported to Amy Jackson. Plaintiffs

5    provided the Court with no evidence demonstrating that the two female employees working

6    at EJM's Cincinnati, Ohio facility, Brandy Kropoff and Michelle Leihgeber, also alleged to

7    have participated in similar conduct, reported to Chakerian.[11] Given that Plaintiffs have made

8    no showing that they and the five female employees alleged to be similarly situated reported

9    to the same supervisor, their gender discrimination claim fails. *See, Hargrow* at 15-17.  Even

10   assuming the female employees did report to the same supervisor as Plaintiffs, Plaintiffs

11   remain unable to satisfy this prong because the alleged conduct of the five female employees

12   was *not* unwelcome by Plaintiffs and others at the Phoenix base as it was in the case of Ms.

13   McCrea.  In other words, Plaintiffs did not complain about the alleged conduct or display any

14   type of aversion toward the alleged conduct.  Furthermore, there is no record of complaints

15   of harassment or offensive conduct lodged with EJM management concerning the female

16   employees during the time in which the alleged conduct allegedly occurred or even shortly

17   thereafter that resulted in internal or external investigations. According to the record, "[Lead

18   Pilot Giovanni] Tonti never brought any complaints to him [Chakerian] about any employee

19   sexually harassing any other employee." Moreover, Plaintiffs' comments to Sterling during

20   his investigation of Plaintiff' conduct toward McCrea does not necessitate a finding that

21   Plaintiffs and the five female employees at issue were "similarly situated." Of critical

22   significance is the fact that Sterling was not a member of EJM management, and therefore,

23   any statement made to him does not amount to a statement made to management or employer

24   and thus does not automatically confer knowledge upon EJM.  Furthermore, any statements

25   made to Sterling were made *in the course of* an investigation for the purposes of unfolding

26   _____

27       [11]  Plaintiffs did not identify Kropoff and Leihgeber's supervisor .

28                                                    - 24 -

the actual events surrounding the allegations of sexual harassment. Thus, the Court does not consider such statements as complaints per se, as Plaintiffs' remarks were not complaints of sexual harassment; Plaintiffs did not report that they were offended by the conduct or that they found it harassing contemporaneous to the actual conduct. Rather, Plaintiffs were simply cooperating with an investigation by reporting it in protest of the allegations against them.

Several courts outside of the Ninth Circuit that have been presented with comparable factual scenarios have determined that employees alleged to have engaged in similar conduct are not "similarly situated" to the plaintiff under the law where complaints of such conduct have not been made to management *in response to the conduct*. Despite the fact that they do not hold precedential value, these cases provide this Court with valuable and persuasive guidance on the issue.  For example, in *Yeager v. City Water and Light Plant of Jonesboro, Ark.*, 454 F.3d 932 (8th Cir. 2006), the plaintiff was discharged for a single, admitted instance of inappropriate conduct in violation of the company's sexual harassment policy. The plaintiff argued that a female coworker was similarly situated where she "openly and frequently" engaged in similar conduct in violation of defendant's harassment policy, but was never reprimanded. *Id*. at 932-33. The accusations about the female worker, which she denied, were not made contemporaneous to her conduct. Rather, the reports were first brought to management's attention by employees protesting the discharge of the plaintiff. *Id.* at 934. The Eighth Circuit affirmed the trial court's ruling that the plaintiff and female coworker were *not* similarly situated. The court explained:

> An employer that promulgates a sex harassment policy may reasonably distinguish between sexually oriented conduct that elicits a complaint from an offended coworker, and arguably comparable conduct nonetheless tolerated by co-workers without complaint. Thus, both the absence of contemporaneous complaints against [the female coworker] and the fact that [plaintiff] admitted his misconduct, justified [defendant] in treating these two employees as not similarly situated from the standpoint of compliance with its sex harassment policy.

*Id.* at 934.

1    Likewise, in *Morrow, et al v. Wal-Mart Stores*, 152 F.3d 559 (7th Cir. 1998), the

2    Seventh Circuit rejected a similar argument made by two plaintiffs.  The plaintiffs pointed

3    to several co-workers as examples of  similarly-situated female employees who allegedly

4    received more favorable treatment by Defendant employer. Plaintiffs maintained that the

5    women often made crude comments with sexual connotations, and asserted that management

6    was informed of this fact during the investigation of the complaint against one of the

7    plaintiffs. The court determined that  because "no complaint was ever lodged [against her]

8    for specific conduct that a co-employee found to be offensive or harassing," the women were

9    not similarly situated and were therefore never disciplined by Defendant for their alleged

10   behavior. Thereafter, the appellate court observed:

> Wal-Mart's quick decision to terminate the plaintiffs may seem unfair in a
> work environment that appears rife with similarly off-color conduct. We have
> noted time and again, however, that "we do not sit as a super-personnel
> department that reexamines an entity's business decisions. Title VII prohibits
> discriminatory employment actions, not hasty or ill-considered ones. Although
> some of Wal-Mart's female employees seem to have engaged in questionable
> behavior, **there is no evidence that any of this behavior sparked complaints
> of harassment like those that Wal-Mart received concerning [plaintiffs].
> Without evidence of similar employee complaints, Wal-Mart cannot be
> faulted for failing to respond to these incidents in the same way that it
> responded to [plaintiffs'] situations.**

17   *Id*. at 564 (citation omitted)(emphasis added).

18   Likewise, there is no evidence that EJM ever received sexual harassment complaints

19   regarding the female co-workers[12] from Plaintiffs, other employees at the Phoenix base, or

20   any fellow employees at the Cincinnati, Ohio facility.

21   Finally, it is well established in the Ninth Circuit that to satisfy the requirements of

22   the *prima facie* case of discrimination, Plaintiff must demonstrate that he or she was

---

[12] Plaintiffs contend that Brandy Kropoff, Michelle Leihgeber, Robyn McCrea, Karen O'Neill, and Marlee Powell are all female co-workers who at some point in time behaved in such a way that violated EJM's sexual harassment policy and therefore are similarly situated to Plaintiffs .

discharged following protected activities of which the employer was aware. *Rolfe v. State of Ariz.,* 578 F.Supp. 1467, 1471 (D. Ariz. 1983) *Kauffman v. Sidereal Corp.,* 695 F.2d at 345, *quoting Aguirre v. Chula Vista Sanitary Service,* 542 F.2d 779, 781 (9th Cir.1976). The relevant inquiry here is whether EJM knew a sufficient amount regarding the womens' alleged conduct to trigger an investigation. *Id.* For an investigation to be triggered, the Plaintiffs must establish that the womens' conduct prompted a complaint of sexual harassment to management. *Id.* Even assuming at least one EJM manager knew of any of the womens' alleged conduct, there must be evidence that EJM had received a *complaint* from an employee who felt *harassed* by such conduct. *Id.* There is no such evidence in the record. Consequently, the Plaintiffs have not demonstrated the existence of a genuine issue of material fact regarding their contention that EJM treated similarly situated female employees more leniently under the company's sexual harassment policy.

**Legitimate Nondiscriminatory Reason**

Assuming arguendo that Plaintiffs have successfully established a prima facie case of discrimination, the burden of production shifts to EJM to produce 'some evidence' in order to articulate a legitimate nondiscriminatory reason for terminating Plaintiffs' employment. *See Burdine,* 450 U.S. at 253-54. To determine whether EJM met its burden of production, the Court must accept as true EJM's evidence supporting its alleged reason for terminating Plaintiffs (i.e. Plaintiffs violated the terms of EJM's employee harassment policy). *Bodett*, 366 F.3d at 744 *(citing St. Mary's,* 509 U.S. at 509).

The undisputed evidence establishes that Plaintiffs were discharged for violating EJM policy as a result of their inappropriate conduct. It further reveals that two complaints of sexual harassment were lodged by a flight attendant coworker of Plaintiffs and consequently, both internal and external investigations were conducted by EJM. Significantly, Plaintiffs admitted to some of the misconduct alleged in the complaints and other allegations were corroborated either directly or indirectly by their co-workers. Accordingly, the Court finds

1  that EJM has successfully articulated a legitimate reason for terminating Plaintiffs'
2  employment.

3  **Pretext**

4          EJM has articulated a legitimate nondiscriminatory reason for terminating Plaintiffs.
5  Thus, the burden shifts to Plaintiffs to demonstrate that said reason is a pretext for unlawful
6  discrimination by "either directly persuading the court that a discriminatory reason more
7  likely motivated the employer or indirectly by showing that the employer's proffered
8  explanation is unworthy of credence." *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1124
9  (9th Cir. 2000)(quoting *Burdine*, 450 U.S. at 256). Critical to this stage of *McDonnell*
10 *Douglas* is Plaintiffs' ability to provide *specific* and *substantial* evidence to overcome the
11 legitimate reasons set forth by EJM. *Bergene v. Salt River Project Improvement & Power*
12 *Dist.*, 272 F.3d 1136, 1143 (9th Cir. 2001).

13         Plaintiffs have presented the Court with evidence that "inappropriate conduct" is not
14 included in the list set forth in Employee Handbook Policy #126, and therefore, they contend
15 that such a violation is not a valid reason for termination. However, EJM rebuts by arguing
16 that the lack of such an obvious inclusion does not mean that EJM tolerates or condones such
17 conduct. EJM correctly points out that the exhibit plainly indicates that the list is *not*
18 *exhaustive* of those "acts/actions that may require immediate disciplinary action." *Id.*
19 Moreover, EJM submits that there is some conduct, such as that engaged in by Plaintiffs, that
20 plain common sense dictates should not occur in the workplace.

21         Plaintiffs do not dispute that McCrea lodged complaints against them, that EJM
22 thoroughly investigated McCrea's allegations, or that they admitted to some of the
23 misconduct McCrea attributed to them. What they do dispute is EJM's decision in April 2003
24 that McCrea was "more credible than not." (*See,* DSOF at ¶¶ 138-139.) However, this does
25 not establish that EJM discharged Plaintiffs ***because of*** their sex, race, or national origin. As
26 articulated by EJM, when presented with the Sterling Report, EJM, in the exercise of its

27

28                                                    - 28 -

management prerogative, could have accepted either Plaintiffs' or McCrea's version of events, or some combination thereof, as the truth. The Company accepted McCrea's version of events and whether that credibility determination was, in fact, correct has no bearing on this case. The only relevant inquiry is whether the Company's stated reason for the terminations-Plaintiffs' inappropriate conduct, was not the true reason for the termination, but rather pretext for unlawful discrimination.

According to the record, Defendants have established that Plaintiffs were discharged for engaging in inappropriate conduct in the workplace. (DSOF 148.) For example, Hawn admitted to pinching flight attendant Robyn McCrea on the buttocks. (DSOF 83-84.) Prince admitted to sending McCrea sexually explicit e-mails. (DSOF 99.) Aldrich admitted to telling "dirty jokes" (DSOF 108) and was disciplined very early in this case for his inappropriate jokes; (DS0F 42-44) he does not contend this discipline was discriminatory. Plaintiffs *admitted* to engaging in inappropriate conduct toward McCrea. (DSOF 27, 41, 83-84, 97-98, 99, 108.) Altan reported that Powell told her that Hawn "had slapped her on the butt . . ." (DSOF 122.) Tonti reported that he had been instructed by Chakerian to counsel Aldrich to "quit making stupid remarks" and to "talk" to Hawn after the pinching incident, but not to document any of the discussions. (DSOF 113, 116-117.) In light of the substantial evidence produced by Defendants, and Plaintiffs' failure to produce contrary or rebuttal evidence, the Court finds that Plaintiffs have not established that EJM's reasons for discharging them were pretext for unlawful discrimination.

## **CONCLUSION**

Based on the foregoing,

**IT IS HEREBY ORDERED GRANTING** Defendant's Motion for Summary Judgment in favor of Defendants and against Plaintiffs (Doc. 123).

**IT IS FURTHER ORDERED DENYING** Plaintiffs' Motion for Issuance of Order that Plaintiffs' Responses to Two Statements of Fact in Support of Defendant's Summary

Judgment Motion Not be Deemed Admitted (Doc. 148).

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment accordingly.

DATED this 14th day of March, 2008.


Stephen M. McNamee
United States District Judge